## In re Cynthia Gregoire

[689 A.2d 431]

No. 95-228

Present: **Allen, C.J., Gibson, Dooley, Morse and Johnson, JJ.**

Opinion Filed December 13, 1996

*Samuel C. Palmisano* and *Mark Heyman*, VSEA Legal Counsel, Montpelier, for Grievant-Appellee.

*Jeffrey L. Amestoy*, Attorney General, *David K. Herlihy*, Assistant Attorney General, and *F. Michael Seibert*, General Counsel, Department of Personnel, Montpelier, for Appellant State of Vermont.

**Morse, J.** The State appeals from a decision of the Vermont Labor Relations Board granting reinstatement with back pay to grievant Cynthia Gregoire following her dismissal as a state employee. It claims the Board erred in concluding Gregoire's dismissal violated her constitutional right to due process of law and a contract right under Article 14 of the Vermont State Employees Association (VSEA) collective bargaining agreement. The State further contends that the Board erred by reinstating grievant, and in awarding full back pay despite her failure to mitigate damages. We reverse.

At the time of her dismissal on March 14, 1994, Cynthia Gregoire was a Delinquent Tax Compliance Officer for the Department of

Employment and Training (DET). Her primary duty was to collect delinquent unemployment tax contributions. As the most senior officer, Gregoire had responsibility for about 1,000 accounts.

Gregoire had read and signed a copy of Section 8 of DET's Internal Security Policy, which provides:

> In order to avoid any possible conflict of interest, cases involving a close friend or relative should be reassigned to another staff member. If this is not possible due to location, time, etc., then supervisory approval is to be granted before starting the assignment and reviewed by the supervisor after completion.

In the spring of 1993, Gregoire's husband was preparing to open an auto body shop. A coworker of Gregoire's had contributed startup money for the venture, which became the subject of discussions during work at DET. Gregoire's supervisor, David Tucker, cautioned her in March 1993 about using work time for such discussions and advised her to be careful about her involvement with the business venture. He also provided Gregoire with DET's Conflicts of Interest Policy, which states, in part:

> [A]n employee of the department shall not use his/her position to secure special privileges or exemptions for himself/herself or others.
>
> . . . .
>
> This policy shall include but not be limited to the following:
>
> . . . .
>
> 3a: An employee shall not process or otherwise handle any transaction (e.g., claims processing, employer contributions, on the job training contracts, adjudication) between the Department and his/her relatives or business entities in which he/she and/or his/her relatives have a pecuniary interest. . . .
>
> . . . .
>
> 4. An employee shall not engage in any activity which might damage the effectiveness of the programs of the Department of Employment and Training or malign the public image of the Department and its programs.
>
> . . . .
>
> If an employee is unsure as to whether or not a particular situation does indeed represent a conflict of interest, he/she

should submit the facts, in writing, to the division Director who will render a written decision on the matter after consultation with legal staff.

In June of 1993, Gregoire and her husband formed a corporation called GFC, Inc., which operated as Downtown Auto. Her husband was company president, and she was named as secretary. By November 1, 1993, Downtown Auto owed about $150 in unemployment insurance contributions. Gregoire prepared and submitted to DET, on behalf of Downtown Auto, a form indicating that Downtown Auto's tax payment was delinquent. No payment was forthcoming. Downtown Auto was subsequently designated a delinquent account. This account appeared on Gregoire's delinquency list on November 18, 1993. By mid-December, Gregoire was aware that Downtown Auto had appeared on her delinquency list. The business appeared on Gregoire's list in January and February, yet she never told her supervisors that her own business had been assigned to her for collection purposes. On January 31, 1994, Gregoire prepared and submitted, on behalf of Downtown Auto, a DET form for the fourth quarter of 1994 indicating that Downtown Auto owed about $135. Again, Gregoire noted on the form that no payment had been made.

In late December 1993, Tucker learned that the delinquent Downtown Auto account had been assigned to Gregoire. After making an investigation, Tucker sent Gregoire a memorandum in February 1994 entitled "Investigative Meeting," stating that he was "contemplating disciplinary action" in accordance with Article 14. The memorandum stated the reasons for the contemplated disciplinary action and informed Gregoire that an investigative meeting would be held on the matter, that she would have the opportunity to speak on her behalf, and that she had the right to be represented by VSEA. The memorandum read:

> As a result of your action described below, I am contemplating disciplinary action in accordance with Article 14 . . . You have the right to be represented by VSEA during the proceedings connected with this action . . . .
>
> . . . .
>
> If you do not participate in this investigation, a decision will be finalized based on the information available.
>
> You are provided this opportunity to respond so that you can present points of disagreement with what appears as facts such as why and when did you plan to deal with the

case, and why you didn't turn this case over to your supervisor as Department policy and rules require. During this meeting, you may want to identify any circumstances the Department should consider or arguments you wish to offer. In other words, you may present your side of the issue. We want to take all of the facts into consideration before deciding what appropriate actions should be taken.

The letter tracked the language of Article 14(4) of the contract, which provides:

Whenever an appointing authority contemplates dismissing an employee, the employee will be notified in writing of the reason(s) for such action, and will be given an opportunity to respond either orally or in writing. The employee will normally be given 24 hrs. to notify the employer whether he or she wishes to respond in writing or meet in person to discuss the contemplated dismissal. The employee's response, whether in writing or in a meeting, should be provided to the employer within four days of receipt of written notification of the contemplated dismissal. Deadlines may be extended at the request of either party, however if the extension is requested by the employee, the employee will not be carried on the payroll unless it is charged to appropriate accrued leave balances. At such meeting the employee will be given an opportunity to present points of disagreement with the facts, to identify supporting witnesses or mitigating circumstances, or to offer any other appropriate argument in his or her defense.

Section 1(d) of Article 14 lists "dismissal" as a form of discipline for misconduct.

In accordance with Tucker's memorandum a meeting was held on February 28, 1994. Gregoire was represented by VSEA Senior Field Representative Richard Lednicky. At the meeting Gregoire was given an opportunity to dispute the charges against her and submit evidence in her defense. Approximately two weeks later Gregoire received a dismissal notice from DET Commissioner Susan Auld.

Gregoire appealed her dismissal to the Board, claiming that her constitutional right to due process had been violated and that the February memorandum from Tucker failed to comply with the requirements of Article 14(4). Specifically, Gregoire claimed that, because the memorandum did not explicitly state that she faced the

possibility of dismissal, the February 28 meeting was not a pretermination meeting, and thus that her subsequent dismissal was invalid. This challenge was not brought to the attention of DET and was made for the first time at the Board level. Nevertheless, in a divided opinion, the Board ruled that the dismissal was precluded based on the alleged procedural defect in the termination process. Accordingly, the Board reinstated Gregoire with back pay and imposed an alternative penalty of a thirty-day suspension without pay.

## I.

We first address the constitutional issue. The State contends that the Board erred in concluding that due process, as construed in *Cleveland Board of Education v. Loudermill*, 470 U.S. 532 (1985), requires the employer to give explicit notice of contemplated dis-missal, and that a mere statement that "disciplinary action" is contemplated is inadequate.

■ "The collective bargaining agreement vests state employees with a property interest in their employment, thereby raising due process considerations when they are faced with the prospect of discharge." *In re Towle*, 164 Vt. 145, 153, 665 A.2d 55, 61 (1995). The essential requirements of due process are notice and an opportunity to be heard. *Loudermill*, 470 U.S. at 546. In *Loudermill*, the Supreme Court held that due process requires a hearing in advance of termination. *Id.* at 542. The hearing serves as an initial check against mistaken decisions, "essentially, a determination of whether there are reasonable grounds to believe that the charges against the employee are true and support the proposed action." *Id.* at 545-46. The hearing must be preceded by adequate notice and must afford the employee a meaningful opportunity to speak. In particular, *Loudermill* held: "The tenured public employee is entitled to oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story." *Id.* at 546.

A strict reading of *Loudermill* thus does not require the employer to state that disciplinary action is contemplated, much less dismissal. While it refers to the hearing as a chance to determine whether the "proposed action" has a factual basis, it does not render unconstitutional an employer's failure to include in the notice of the charges an explicit statement of what that "proposed action" will be. "Notice," under *Loudermill*, requires no more than notice of the charges, not, as the Board found, notice of potential dismissal. In its effort to

balance the competing interests at stake in the termination process, the Court held that to require more than notice of the charges, an explanation of the evidence, and an opportunity for the employee to present evidence, "would intrude to an unwarranted extent on the government's interest in quickly removing an unsatisfactory employee." *Id.* at 546. A number of courts have since interpreted *Loudermill* to require that the notice be sufficient to alert employees that their job is in jeopardy. See *Calhoun v. Gaines*, 982 F.2d 1470, 1476 (10th Cir. 1992); *Post v. Harper*, 980 F.2d 491, 494 (8th Cir. 1992).

In this case, the memorandum of February 18 notified Gregoire that she was charged with failing to notify her supervisor of the apparent conflict of interest, and that, as a result of that failure, disciplinary action under Article 14 was contemplated. The memorandum further informed Gregoire that a meeting would be held to discuss the allegations, stating that she was entitled to assistance of VSEA counsel, and that she would be allowed to "present points of disagreement with what appears as facts . . . . In other words, you may present your side of the issue. We want to take all of the facts into consideration before deciding what appropriate actions should be taken." In accordance with the memorandum a hearing was held, and Gregoire was given an opportunity to present her side of the story and offer evidence that would demonstrate a lack of just cause to dismiss her. The employer and, on appeal, the Board each found just cause. Furthermore, the Board found that Gregoire "had fair notice that her conduct could result in dismissal." See *Towle*, 164 Vt. at 150, 665 A.2d at 60 ("Knowledge that certain behavior is prohibited and subject to discipline is notice of the possibility of dismissal."). That knowledge, coupled with the notice of charges, opportunity to respond and subsequent hearing, was sufficient to satisfy the *Loudermill* requirements of due process of law.

## II.

We turn now to the contract issue. The Board found that the plain language of Article 14(4) of the contract requires that when an appointing authority is contemplating dismissal it must "explicitly let the employee know of that potential."

■ Substantial deference must be accorded the Board's construction of collective bargaining agreements. *In re Gorruso*, 150 Vt. 139, 143, 549 A.2d 631, 634 (1988). We are obligated, however, to avoid constructions that are "unequal, unreasonable, and improbable, if this

can be done consistently with the words of the contract." *Id.* at 143-44, 549 A.2d at 634.

The plain language of § 4 of Article 14 says nothing about *explicit* notice of contemplated dismissal. Section 4 provides in part, "Whenever an appointing authority contemplates dismissing an employee, the employee will be notified in writing of the reason(s) for such action . . . ." The Board would have this read as, "the employee will be notified in writing [that dismissal is contemplated, and] of the reasons for such action . . . ." We find nothing in the contract as a whole, in the intent of the parties, or in the law, to warrant such an amendment of the plain language. See *Vermont State Colleges Staff Fed'n, AFL Local 4023 v. Vermont State Colleges*, 157 Vt. 645, 646, 596 A.2d 355, 357 (1991) (mem.) (where contract language is clear, parties are presumed to be bound by plain and ordinary meaning).

The Board's construction emphasizes formalism at the expense of the evidentiary purpose of § 4 of Article 14. Section 4 ensures that the factual bases of the charges are laid out so the employee can respond, thus providing an "initial check" against dismissal without just cause. See *Loudermill*, 470 U.S. at 545. The agreement, to be sure, contemplates that employees will be made aware their job is in jeopardy so that they may "respond in writing or . . . meet in person to discuss the contemplated dismissal." Again, however, nothing in the contract states *how* such notice must be conveyed. While it may be better practice to track the precise text of Article 14, we perceive no reason why such notice may not adequately be communicated by other means. That is precisely what occurred here.

Tucker's memorandum of February 18 notified Gregoire that he was "contemplating disciplinary action in accordance with Article 14." Article 14 lists dismissal as a form of discipline. Indeed, the notice procedure outlined in § 4 of Article 14 is required only when dismissal of the employee is contemplated. There was no mistaking the letter as anything other than a notice of contemplated dismissal. From its first sentence notifying Gregoire that disciplinary action was "contemplat[ed]," to its subsequent recitation of the various due process rights to which she was entitled, including the right to be represented, to respond to the allegations in writing or in person, to "present points of disagreement" with the facts, and to "identify any circumstances the Department should consider or arguments you wish to offer," the letter tracked point-by-point the contract language of § 4.

The unmistakable affinity between the memorandum and the pretermination contract language, coupled with Gregoire's own

knowledge that her conduct could result in dismissal, leave no room for doubt. Gregoire could not have failed to understand that her job was in jeopardy. The Board's findings that neither Gregoire nor her counsel at the hearing was aware that dismissal was contemplated, based on their own self-serving testimony, are not credible in light of fact that they knew the consequences of the charges and the import of letters of the kind that Gregoire received. *In re Muzzy*, 141 Vt. 463, 470, 449 A.2d 970, 973 (1982) (findings will be upheld where credible evidence fairly and reasonably supports them). Moreover, the issue is not what the employee claims to have known, but what a reasonable employee in Gregoire's circumstances would have known about her job security. The constitutional and the contractual prerequisites were satisfied.

## III.

Having determined that Gregoire had adequate notice that she could be discharged, the only remaining question is whether to reinstate Gregoire's dismissal. The Board clearly imposed a lesser discipline (thirty-day suspension) not because it concluded that dismissal was too severe, but rather because it believed the pretermination notice was defective and precluded dismissal as a legal option. That issue aside, the Board may impose a lesser discipline only where it finds "there was no just cause for the choice of discipline imposed by the State." *In re Gorruso*, 150 Vt. at 145, 549 A.2d at 635. Here, the evidence and the Board's findings amply support the State's original disciplinary decision, and leave no doubt that "just cause for grievant's dismissal existed as a matter of law." *Id.* at 146, 549 A.2d at 636.

The Board found that the evidence sustained the charge that Gregoire had "intentionally violated the Employer's Internal Security Policy and the Conflict of Interest Policy by shielding the delinquent account of Downtown Auto from the normal procedural collection path." As the Board noted, Downtown Auto was a business primarily owned by Gregoire's husband and also one in which she had some involvement, yet she handled the account for over two months without notifying her supervisors, and no payments were made by the business on the amounts owed during this period. The Board further found that Gregoire was aware of the policy prohibiting such conduct and "had fair notice that such conduct could result in dismissal." Indeed, she "had been specifically warned by [her] supervisor . . . to review the Conflict of Interest policy due to the potential problems that could arise from the Downtown Auto business."

The offense of shielding her family's business from the normal collection process was, as the Board found, "serious," and betrayed "a position with a high degree of trust given the large amounts of monies that she was responsible for collecting." The offense, moreover, "had a substantial adverse effect on [her] supervisors' confidence in [Gregoire's] responsibly performing her duties." Gregoire's conduct, the Board concluded, was "in clear violation of conflict of interest policies which were known to her, compromised her integrity and the trust placed in her." Although its hands were seemingly tied as far as affirming Gregoire's dismissal was concerned, the Board nevertheless concluded that her conduct warranted the "most severe disciplinary penalty short of dismissal." As the Board explained: "The seriousness of [Gregoire's] offense, the breach of trust she committed given her position, and the clear notice she had that such conduct could result in discipline, weigh heavily towards the imposition of a severe disciplinary penalty."

To warrant dismissal, an employee's conduct must constitute "'some substantial shortcoming detrimental to the employer's interests which the law and sound public opinion recognize as good cause for dismissal.'" *Gorruso*, 150 Vt. at 147, 549 A.2d at 636 (quoting *In re Gage*, 137 Vt. 16, 18, 398 A.2d 297, 298 (1979)). As summarized above, Gregoire's conscious and prolonged violation of departmental policy and the public trust was sufficiently egregious to undermine both her employer's and the public's confidence in her continued ability to perform her duties. Although the Board noted that her years of service and potential for rehabilitation were mitigating factors, we are not persuaded that these significantly undermine the State's disciplinary decision. "'The ultimate criterion of just cause is whether the employer acted reasonably in discharging the employee because of misconduct.'" *Id.* at 145, 549 A.2d at 635 (quoting *In re Brooks*, 135 Vt. 563, 568, 382 A.2d 204, 207 (1977)). Judged in the light of this standard, we have no doubt that just cause for Gregoire's dismissal existed as a matter of law.

*Reversed.*

**Gibson, J.,** dissenting. I believe the Labor Relations Board correctly concluded that the State did not comply with Article 14(4) of the collective bargaining agreement in dismissing Cynthia Gregoire as a state employee. Accordingly, I dissent from the Court's reversal of that decision.

Article 14(4) of the collective bargaining agreement provides:

Whenever an appointing authority contemplates dismissing an employee, the employee will be notified in writing of the reason(s) for such action, and will be given an opportunity to respond either orally or in writing. The employee will normally be given 24 hrs. to notify the employer whether he or she wishes to respond in writing or to meet in person to discuss the contemplated dismissal. The employee's response, whether in writing or in a meeting, should be provided to the employer within four days of receipt of written notification of the contemplated dismissal.

On February 18, 1994, Cynthia Gregoire received a memorandum entitled "Investigatory Meeting" from her supervisor, David Tucker, stating that he was "contemplating disciplinary action in accordance with Article 14" in connection with her handling of the delinquent account of her husband's business. The memorandum invited her to attend the "investigatory meeting" on February 23 (later rescheduled to February 28), but did not state that the appointing authority, or Tucker as the authorized representative, was contemplating dismissal as a possible disciplinary action. Tucker was not, in fact, contemplating dismissal at the time he sent the memorandum, and he had not discussed the possibility of dismissal with the Department's appointing authority, Commissioner Susan Auld. Neither Gregoire nor her VSEA representative was aware before or during the February 28 meeting or prior to her dismissal that dismissal was contemplated. Tucker ended his February 18 memorandum, "After reviewing any new information, I will conduct further inquiry as is appropriate, and then contact you." The next communication Gregoire received was the letter of termination from Commissioner Auld.

The Board's interpretations of collective bargaining agreements are entitled to great deference because of its expertise in such matters. *In re Vermont State Employees' Ass'n*, 164 Vt. 214, 216, 666 A.2d 1182, 1183 (1995). Ordinarily, we will not disturb the Board's findings unless they are clearly erroneous. *In re Merrill*, 151 Vt. 270, 273, 559 A.2d 651, 653 (1988). We will uphold the Board's order if its findings of fact, taken as a whole, justify its ultimate conclusion. *Vermont State Employees' Ass'n*, 164 Vt. at 216, 666 A.2d at 1183. The expertise of the Board in construing collective bargaining agreements is presumed, and substantial deference must be accorded the Board's constructions. *In re Gorruso*, 150 Vt. 139, 143, 549 A.2d 631, 634 (1988).

"Where contract language is clear, the parties are presumed to be bound by its plain and ordinary meaning." *Vermont State Colleges Staff Fed'n, AFL Local 4023 v. Vermont State Colleges,* 157 Vt. 645, 646, 596 A.2d 355, 357 (1991) (mem.). The majority states that the plain language of Article 14(4) says nothing about requiring explicit notice of a contemplated dismissal. But Article 14(4) provides that an employee will normally be given twenty-four hours to indicate to the employer whether she wishes *"to discuss the contemplated dismissal"* and that she may respond in writing or in a meeting "within four days of receipt of *written notification of the contemplated dismissal."* (Emphasis added.) This language clearly requires explicit written notice whenever dismissal is being considered.

In *Cleveland Board of Education v. Loudermill,* 470 U.S. 532 (1985), the United States Supreme Court "recognized the severity of depriving a person of the means of livelihood," *id.* at 543, stating that the "opportunity to present reasons . . . why *proposed action* should not be taken is a fundamental due process requirement." *Id.* at 546 (emphasis added). The collective bargaining agreement makes clear what is implicit in *Loudermill* — that the employer must give written notice to an employee of any contemplated dismissal. The Board concluded that the agreement requires such notice, and that notification simply that "disciplinary action" is being contemplated is not sufficient.

Federal courts construing *Loudermill* have reached the same conclusion. See *Calhoun v. Gaines,* 982 F.2d 1470, 1476 (10th Cir. 1992) (implicit in notice required before dismissal of public employee is requirement that employee be made aware that employment is in jeopardy); *Matthews v. Harney County, Or.,* 819 F.2d 889, 892 (9th Cir. 1987) (*Loudermill* requires notice to employee of pendency or contemplation of dismissal action in advance of any pretermination hearing); cf. *Post v. Harper,* 980 F.2d 491, 494 (8th Cir. 1992) (although employer not required to tell employee that hearing is pretermination hearing, employee needs to know that job is in jeopardy).

The majority ignores one of the major purposes of the notice requirement in the collective bargaining agreement. The United States Supreme Court pointed out in *Loudermill* that "[e]ven where the facts are clear, the appropriateness or necessity of the discharge may not be; in such cases, the only meaningful opportunity to invoke the discretion of the decisionmaker is likely to be before the termination takes effect." *Loudermill,* 470 U.S. at 543. Having received no notice that her job was in jeopardy, Gregoire and her VSEA repre-

sentative were deprived of an opportunity to argue against such sanction. The Board recognized this truth, and the majority, in rejecting the Board's decision, is simply substituting its own opinion for that of the Board without giving due deference to the Board's expertise.

I respectfully dissent, and am authorized to say that Justice Johnson joins in this dissent.

**Johnson, J.,** dissenting. I agree with Justice Gibson that the Labor Relations Board correctly interpreted the notice requirements of Article 14(4) of the collective bargaining agreement. I write separately to emphasize my disagreement with the majority's ultimate conclusion: that the existence of just cause to discipline an employee eliminates the State's obligation to comply with the demands of procedural due process.

The majority emphasizes what appears to be undisputed: that Gregoire was aware that her conduct violated the policies of the Department of Employment and Training (DET), and that the violation was serious enough possibly to result in dismissal. Indeed, the Board specifically found that Gregoire "had fair notice that her conduct could result in dismissal." This finding supports the Board's conclusion that just cause existed to discipline Gregoire. An employee may not be disciplined for certain conduct unless the employee had fair notice, express or implied, that the conduct could be grounds for discipline. See *In re Towle,* 164 Vt. 145, 150, 665 A.2d 55, 59 (1995) (discharge for just cause will be upheld if discharging employee for misconduct is reasonable and employee had express or implied notice that such conduct would be grounds for discharge).

This basic requirement of fairness — that employees may not be fired or otherwise punished unless they know or should know that their "behavior is prohibited and subject to discipline," *id.* at 150, 665 A.2d at 60 — is separate from the procedural requirements imposed by the collective bargaining agreement. The agreement spells out the notice that must be given to an employee whose job is actually in jeopardy — that is, an employee who is accused of misconduct and may be fired as a result. I share Justice Gibson's opinion that the agreement requires such notice to specifically inform the employee that the State is contemplating dismissal. The majority, however, rejects this straightforward rule, and instead holds that notice may "be communicated by other means." 166 Vt. at 73, 689 A.2d at 435.

What "other means" are appropriate? The answer in this case is that, because Gregoire knew her actions violated DET policy, she

must have known that the State was contemplating dismissal. Put another way, because Gregoire was in fact "guilty" of the alleged misconduct, she was not entitled to the procedural protections of the contract. The finding of just cause obviates the need for procedural protections; since Gregoire knew that her misconduct could be grounds for discharge, according to the majority she "could not have failed to understand," *id.* at 74, 689 A.2d at 435, that the State was in fact considering firing her.

This conclusion directly conflicts with the Board's finding that Gregoire was not aware before or during the meeting that the State was contemplating dismissal. Although the majority disregards this finding, it is supported by credible evidence and should not be disturbed on appeal. See *P.F. Jurgs & Co. v. O'Brien*, 160 Vt. 294, 300, 629 A.2d 325, 329 (1993) (findings of fact will be set aside only when clearly erroneous, with due regard to opportunity of trial court to judge credibility of witnesses and weight of evidence). In fact, Gregoire's supervisor was not considering dismissal at the time he sent the memorandum, and none of the State's representatives at the meeting mentioned that they were considering firing Gregoire.

What is much worse, however, is that the majority has constructed a double standard under the collective bargaining agreement. "Guilty" employees are *no longer* entitled to the procedural protections that state employees bargained for and won. Their very misconduct is now sufficient notice that the State is considering firing them. Only innocent employees, who presumably cannot be fired anyway, must be given explicit notice that dismissal is contemplated. This is little different from holding that only innocent defendants in criminal cases are entitled to constitutional protections.

I respectfully dissent. I am authorized to state that Justice Gibson joins in this dissent.