2009 VT 21

# Vermont State Employees' Association v. State of Vermont and Robert Hofmann

[971 A.2d 641]

No. 07-213

Present: **Reiber, C.J., Dooley, Johnson, Skoglund and Burgess, JJ.**

Opinion Filed February 13, 2009

*Michael P. Casey*, Vermont State Employees' Association, Montpelier, for Plaintiff-Appellee.

*William H. Sorrell*, Attorney General, and *Bridget C. Asay*, Assistant Attorney General, Montpelier, for Defendants-Appellants.

¶ 1. **Skoglund, J.** On August 2, 2006, the Vermont State Employees' Association (VSEA) filed an unfair-labor-practice charge against the Vermont Department of Corrections. In the charge, VSEA contended that the Department interfered with employee rights and breached its duty to bargain in good faith, in violation of 3 V.S.A. § 961(1) and (5), by issuing a disciplinary guidance memorandum to its employees — VSEA bargaining-unit members — and by collecting employee signatures on the memorandum for placement in their personnel files.

¶ 2. After conducting an investigation of the charge, the Vermont Labor Relations Board issued an unfair-labor-practice complaint against the Department. The Board then held a merits hearing and, on May 8, 2007, issued findings of fact and an opinion determining that the Department had, indeed, committed an unfair labor practice. The Department appeals the Board's determination. We affirm.

¶ 3. The following facts were found by the Board or are uncontroverted. VSEA is the exclusive bargaining representative of the Department's supervisory and corrections employees. Through the process of collective bargaining, VSEA and the Department have entered into an agreement governing, among other things, the imposition of disciplinary actions and the promulgation of work rules.

¶ 4. Article 14 of the collective-bargaining agreement governs the Department's imposition of disciplinary actions, and is reproduced in pertinent part in Appendix I. Article 14 provides that no employee "shall be disciplined without just cause," and obligates the Department to "apply discipline . . . with a view toward uniformity and consistency" and to "impose a procedure of progressive discipline." Under Article 14, the progression of discipline starts with oral and written reprimands and escalates to suspension and dismissal. Article 14 does not mandate progressive discipline in all cases; rather, it provides that "[t]he parties agree that there are appropriate cases that may warrant the [Department] . . . bypassing progressive discipline." Article 14 does not go into any detail as to what these "appropriate cases" may be. Finally, under Article 14, the Department generally must give employees two weeks' notice or two weeks' pay in lieu of notice prior to dismissal, but may disregard this notice provision in cases of gross neglect of duty, gross misconduct, refusal to obey lawful and reasonable orders given by supervisors, conviction of a felony, and conduct that jeopardizes the life or health of a coworker or person under the employee's care.

¶ 5. Article 17 of the collective-bargaining agreement governs the Department's issuance of written work rules, and is reproduced in pertinent part in Appendix II. Article 17, § 2 requires the Department to give employees and VSEA at least fifteen days' written notice of the promulgation of or changes to written work rules. Article 17, § 1 circumscribes the content of written work rules; it prohibits work rules from being "in conflict with existing law, [or] contract provisions," and requires that "[w]ork rules . . . relate to aspects of employment . . . and not to fundamental conditions of work which give rise to a statutory bargaining obligation." Pursuant to Article 17, § 1, proper subjects of written work rules are aspects of employment "such as Public Safety work rules outlining proper maintenance schedules for cruisers, [and] rules for use of State-owned property and equipment." Finally, Article 17, § 3 empowers an employee or VSEA to grieve the reasonableness of any written work rule.

¶ 6. Prior to the events that led to this case, the Department promulgated work rules pursuant to the Article 17, § 2 procedures. Those work rules are reproduced, in pertinent part, in Appendix III. Relevant provisions of the work rules prohibit employees from violating the collective-bargaining agreement, laws, or ordinances,

from engaging in malicious, demeaning, harassing, or insulting behavior, from transacting business with inmates, from having romantic or sexual relationships with inmates, and from otherwise reflecting discredit on the Department. Among other things, the work rules also require employees to be honest in their descriptions to the Department of events relating to their employment and to cooperate fully with the Department's inquiries and investigations.

¶ 7. In or around June 2004, a group of the Department's upper management decided to issue a memorandum to employees providing guidance on the imposition of discipline for misconduct. The group also included Peter Garon, the personnel administrator assigned by the Department of Human Services to the Department. It took the group approximately fifteen months to complete a final draft of the memorandum. The group intentionally excluded VSEA from involvement in preparing the memorandum, and decided not to provide the memorandum to VSEA until a few days before issuing it to employees.

¶ 8. On August 29, 2005, about two weeks before the memorandum was issued, Garon wrote the following paragraph for inclusion in the Department's report to the Governor:

> For some time the Department has been working with staff from the Department of Human Resources to develop a new paradigm for discipline. We are taking a common sense step to eliminate ambiguity and to put us in a stronger position in holding employees accountable for misconduct. We anticipate that these steps will allow us to respond more appropriately to egregious employee misconduct. Starting September 12 the Department will introduce an updated statement of expectations to all staff. We expect that our actions will create a measure of concern and reaction from VSEA.

¶ 9. On Monday, September 12, 2005, Robert Hofmann, Commissioner of the Department, sent copies of the disciplinary-guidance memorandum to all Department employees and requested that employees sign the memoranda. VSEA filed an unfair-labor-practice charge with the Vermont Labor Relations Board on September 23. After the Board issued an unfair-labor-practice complaint, the Department and VSEA engaged in settlement discussions. As a result, the Department changed portions of

the memorandum to address some of VSEA's concerns, but the parties did not resolve all disputed issues.

¶ 10. On April 7, 2006, Commissioner Hofmann emailed the revised disciplinary-guidance memorandum to all Department employees. The revised memorandum forms the basis of this suit. The entire text of the memorandum follows:

> Over the past eighteen months, there have been a number of changes within the Department designed to help us better achieve our core values. For example, we have enhanced our training curriculum for CSS's and made other changes at the Academy, instituted a supervisory training program, and have reinstituted the Quality Assurance Unit.
>
> An important and vital core activity is accountability. Just as employees deserve praise when they excel, so too must they be held accountable when they fall below expectations, or worse, betray the public's confidence in their ability to conduct themselves in a manner beyond reproach.
>
> Of late, we have heard two concerns that relate to the subject of personal accountability. The first is that certain Work Rules are couched in terms too general to provide employees with concrete explanations regarding their performance. We have considered this concern carefully. At this time, we do not believe the Work Rules should be amended. However, we do believe that it may be helpful to provide employees with concrete examples of conduct that is likely to substantially impair, if not immediately end, their career with the Department.
>
> The second concern is that the DOC Policies have been applied inconsistently and unfairly. Again, we have considered this complaint carefully. While in the great majority of cases the DOC Policies have been applied with uniformity, there have indeed been cases where inconsistencies have emerged. We believe providing more detailed guidance to managers and staff regarding the Department's expectations will work to reduce any further inconsistencies.

The list that follows is designed to address the two concerns of accountability and the past inconsistent application of DOC Policies. This list sets forth the Department's current emphasis on the behavior and performance expected of Department employees and the consequences Department employees can expect for failure to abide by Department expectations and Policies.

The vast majority of our colleagues consistently adhere to the behavior expected for staff. Therefore, for most staff there will be no surprises and no dispute over the content of this list. However, if it is established that an employee's actions violate DOC work rules in the manner noted below, the Department will likely, subject to its collective bargaining agreements with [VSEA], impose severe disciplinary action up to and including immediate dismissal against that employee. Please note that the specific level of discipline will be established after appropriate and thorough review of the facts.

After reviewing this document, everyone should be aware that the Department is at this time clarifying expectations for employee conduct and providing guidance on what discipline may be expected for failure to meet these expectations.

The items that follow are examples of misconduct, which in the Department's view will likely lead to severe discipline up to and including immediate dismissal. This list is not all-inclusive and there are other actions that may fall under the same category.

A. *Welfare of Individuals Under the Supervision of the Department*

1. Physically or mentally abusing anyone under the supervision of the Department; (See DOC Work Rules #1, 3, 6, 9)

2. Failing to protect an inmate in a facility from physical or mental abuse by others; (See DOC Work Rules #1, 3, 6, 9)

3. Violation of DOC Work Rule #13 in interactions with anyone under the supervision of the Department; (See DOC Work Rules #1, 6, 9, 13)

4. Providing contraband (see lists in each facility) to an inmate in a facility whether or not compensation is received; (See DOC Work Rules #1, 7, 9)

5. Failing to perform required checks of inmate(s) in a facility (See DOC Work Rules #1, 3, 6, 9)

6. Engaging in unlawful discrimination (for example, discrimination based on race, sexual orientation, sex). (See DOC Work Rules #1, 9, 10)

B. *Other Employee Misconduct*

1. Failure to fully and truthfully report events in the workplace or in other circumstances related to employment; (See DOC Work Rules #1, 4, 5)

2. Conviction of a felony; (See DOC Work Rules #1, 9, 10)

3. Incarceration as a result of conviction for any crime; (See DOC Work Rules #1, 9, 10)

4. Conviction of a crime involving violence. (See DOC Work Rules #1, 9, 10)

**If there are any Department employees who previously believed that the foregoing conduct would or should result in relatively light discipline, *they must change their expectations immediately.***

We recognize, of course, that it is impossible to provide an exhaustive list of all potential employee misconduct that could lead to discipline up to and including immediate dismissal. Nonetheless, we believe that the foregoing list will prove helpful in guiding Department employees' future performance as well as future disciplinary decisions.

The purpose of this Disciplinary Guidance memo is to clarify what is expected of employees and to ensure they are treated fairly and equitably. This memo does not change the Department's Work Rules, does not alter any

terms in the collective bargaining agreement, nor is it intended to impose conditions of employment over and above those set forth in the Department's work rules or its collective bargaining agreement with the VSEA. An employee's signature acknowledges that an employee has received the Disciplinary Guidance memo and does not mean that an employee necessarily agrees with the statements contained herein. An employee's signature on this memo does not constitute a waiver of an employee's right to contest any discipline under the collective bargaining agreement. Any employee who does not understand the contents of this memo or what is expected of them in light of this memo is directed to contact their supervisor for further clarification. Any employee who is not aware of their rights with respect to discipline can contact their VSEA representative.

Finally, the Department expresses our appreciation to the vast majority of employees who refrain from the above behavior and perform their jobs in a professional manner, day in and day out, under very difficult circumstances.

**I certify that I have received and read the contents of this memo:**

_____

**Employee Signature**

_____

**Employee Name Date**

¶ 11. The same day that Hofmann emailed the revised memorandum to Department employees, Garon emailed Department managers instructing them to ask employees to sign the memorandum. Although Garon told the managers not to direct, order, or coerce employees to sign, he directed managers to give the following written feedback to employees who refused to sign: "This is supervisory feedback. You were asked to sign a memo indicating that you had received and read the Disciplinary Guidance memo. You did not do so. This does not meet expectations." Under Article 14 of the collective-bargaining agreement, written feedback is the first step in progressive corrective action. One

week later, Garon sent another email to management, reiterating the supervisory-feedback instruction and advising management to "anticipate a huge hew [sic] and cry from individuals, and probably an equally loud and even more pitiful noise from VSEA headquarters."

¶ 12. Roughly three weeks after the revised memorandum was distributed, Garon directed Department managers to cease giving written supervisory feedback to employees for refusing to sign the memorandum, and to retract and destroy any copies of feedback that had already been given. The Department did not provide employees who had already signed the opportunity to withdraw their signatures. The Department did not inform nonmanagement employees that they were not obligated to sign the memorandum.

¶ 13. Vermont's labor-relations laws provide a framework for the relationship between state employees and the State as employer. In 1969, the Legislature enacted the State Employees Labor Relations Act (SELRA), 3 V.S.A. §§ 901-1007, thereby establishing the right of state employees to self-organize, "to form, join or assist employee organizations; to bargain collectively through representatives of their own choice, and to engage in concerted activities for the purpose of collective bargaining or other mutual aid or protection." *Id.* § 903(a).

¶ 14. Having established those rights, the Legislature defined the subjects over which the State is obligated to bargain with employees' collective-bargaining representatives as follows:

> All matters relating to the relationship between the employer and employees shall be the subject of collective bargaining except those matters which are prescribed or controlled by statute. Such matters appropriate for collective bargaining to the extent they are not prescribed or controlled by statute include but are not limited to:
>
> . . . .
>
> (3) Working conditions;
>
> . . . .
>
> (7) Grievance procedures;
>
> . . . .
>
> (9) Rules and regulations for personnel administration . . . .

*Id.* § 904(a). When the State breaches its statutory duty to bargain over the above subjects, it commits an unfair labor practice under § 961(1) and (5). Section 961 provides that it is an unfair labor practice for the State:

> (1) To interfere with, restrain or coerce employees in the exercise of their rights guaranteed by section 903 of this title, or by any other law, rule or regulation. [or]
>
>  . . . .
>
> (5) To refuse to bargain collectively with representatives of the employees . . . .

*Id.* § 961.

¶ 15. In this case, the Board held that the Department's issuance of the revised memorandum for employee signature was a unilateral change in a condition of employment over which the Department was obligated to bargain. The Board noted the Department's obligation to bargain over "matter[s] relating to the relationship between the [Department] and [its] employees." *Id.* § 904(a). The Board further determined that a "change . . . impacting the [Department's] decision whether to discipline employees clearly concerns the employer-employee relationship," and thus was subject to the bargaining obligation. Finally, the Board concluded that the Department's circulation of the memorandum for signature was such a change, implemented unilaterally and thus improperly.

¶ 16. Specifically, the Board reasoned that the Department's listing of specific instances of misconduct that were "likely [to] lead to severe discipline up to and including immediate dismissal" announced "more stringent disciplinary standards" because the listing inappropriately simplified whether "just cause" existed for a particular disciplinary action, a determination governed by Article 14 of the parties' collective-bargaining agreement. The Board used two examples to illustrate its point.

¶ 17. First, the Board noted the memorandum's admonishment that "[e]ngaging in unlawful discrimination" was likely to lead to severe discipline, but reasoned that "[t]here is a wide range in the degree of seriousness of discrimination that may be engaged in by employees." The Board observed that the parties recognized as much by providing the following in Article 5, § 3 of their collective-bargaining agreement: "The employer will notify employees,

supervisors or managers at every level that any person who by action or condonation subjects another employee to harassment in the form of . . . insults or jokes based upon a factor for which discrimination is prohibited by law . . . shall be subject to appropriate discipline." The Board reasoned that without specifying what constituted "appropriate discipline," the parties left the determination of the penalty up to the general standards of discipline in Article 14, which requires that discipline be imposed for just cause, establishes a procedure for progressive discipline (oral reprimand, written reprimand, suspension, dismissal), and provides that progressive discipline may be bypassed in appropriate cases. Finally, the Board concluded that the Department "[went] beyond these contractually agreed upon standards in the disciplinary guidance memorandum by providing that engaging in unlawful discrimination likely will lead to severe discipline." "The contracts," reasoned the Board, "unlike the disciplinary guidance memorandum, do not provide that severe discipline is 'likely' in cases of unlawful discrimination," instead, "the determination of appropriate discipline pursuant to the Contracts can only be made after consideration of the particular circumstance of a case."

¶ 18. Second, the Board pointed out that the disciplinary-guidance memorandum elsewhere listed "failure to fully and truthfully report events in the workplace or in other circumstances related to employment" as an example of misconduct likely to lead to severe discipline up to and including dismissal. Under the parties' collective-bargaining agreement, the Board concluded that "[i]t is too simplistic to provide that failure to 'fully' report events will likely lead to severe discipline." "It is not difficult," the Board reasoned, "to conceive of situations where an employee omits some detail from a report of an incident because the employee reasonably believes that the detail is not of consequence or understands from an accepted prior practice in the workplace that it is not necessary to report the detail. The likeliness of severe discipline in such circumstances is not apparent." Therefore, the Board ruled, the Department "has gone beyond [] contractually agreed upon standards in the disciplinary guidance memorandum by providing that failure to fully report events likely will lead to severe discipline."

¶ 19. We give substantial deference to the Board in decisions that lie within its area of expertise, *In re Merrill*, 151 Vt. 270, 272, 559 A.2d 651, 652-53 (1988), and presume its decisions are

correct, valid and reasonable, *In re Lilly*, 173 Vt. 591, 592, 795 A.2d 1163, 1167 (2002) (mem.). This deference extends to the Board's interpretation of employment contracts, *In re West*, 165 Vt. 445, 448, 685 A.2d 1099, 1102 (1996) ("Interpretations of collective bargaining agreements are within the particular expertise of the Board, and we review such interpretations with great deference to the Board's expertise."); see also *In re Vt. State Employees Ass'n*, 2005 VT 129, ¶ 7, 179 Vt. 228, 893 A.2d 333; *In re Gregoire*, 166 Vt. 66, 72, 689 A.2d 431, 435 (1996) ("Substantial deference must be accorded the Board's construction of collective bargaining agreements."), and to the Board's construction and application of SELRA, *Vt. State Employees' Ass'n v. State*, 151 Vt. 492, 493, 562 A.2d 1054, 1055 (1989) ("[A]bsent compelling indication of error, interpretations of [SELRA] by [the Board] will be sustained on appeal." (quotations omitted)). Given this standard of review, we see no reason to reverse the Board's decision.

¶ 20. At the outset, we reject the Department's suggestion that we rule that a unilateral change in conditions of employment is not unlawful under SELRA unless it is "material, substantial, and significant." The Department finds this language in federal case law interpreting the National Labor Relations Act (NLRA), the federal statutes governing private-sector labor relations.[1] See, e.g., *Alamo Cement Co.*, 281 N.L.R.B. 737, 738 (1986) ("[Under the NLRA], for a statutory bargaining obligation to arise with respect to a particular change unilaterally implemented by an employer, such change must be a material, substantial, and a significant one

---

[1] Unlike SELRA's § 904, the NLRA does not devote a specific statutory provision to defining subjects over which employers and employees must bargain. The only statutory guidance in the NLRA on this score is § 8(d), which provides:

> For the purposes of this section, to bargain collectively is the performance of the mutual obligation of the employer and the representative of the employees to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment . . . .

29 U.S.C. § 158(d). While SELRA broadly requires employers to bargain as to "[a]ll matters relating to the relationship between the employer and the employees," 3 V.S.A. § 904(a), the NLRA enumerates "wages, hours, and other terms and conditions of employment" as the exclusive mandatory subjects of bargaining. We have found the difference in language significant in the past. *Vt. State Colleges Faculty Fed'n v. Vt. State Colleges*, 138 Vt. 451, 454-56, 418 A.2d 34, 36-37 (1980) (declining to adopt federal distinction between mandatory and permissive bargaining in the SELRA context because of this difference in language).

affecting the terms and conditions of employment." (quotation omitted)); see also *Microimage Display v. NLRB*, 924 F.2d 245, 253 (D.C. Cir. 1991) (endorsing the NLRB's "material, substantial, and significant" standard). In addition, the Department essentially claims that the Board has already adopted the "material, substantial, and significant" standard by recognizing a de minimis exception in *International Brotherhood of Police Officers, Local 475 v. City of Burlington*, 7 V.L.R.B. 356, 357-58 (1984), and asks us to rule that the Board erred in not explicitly adopting and applying the standard here.

■ ¶ 21. We decline to adopt the Department's suggestion for several reasons. We note first that in the *International Brotherhood* case the Board was not interpreting SELRA, but rather provisions of the Vermont Municipal Labor Relations Act (MLRA). *Id.* at 356. Specifically, the Board was presented with the issue of whether the City of Burlington's unilateral change in the days on which police officers would be paid violated the City's duty to "bargain in good faith with respect to wages, hours and conditions of employment" under 21 V.S.A. § 1725(a). The Board declined to issue an unfair-labor-practice complaint in *International Brotherhood* because it found that the "actual impact on workers . . . appear[ed] to be de minim[i]s." 7 V.L.R.B. at 357. Therefore, even if the de minimis standard were identical to the "material, substantial, and significant" requirement, the Board has never adopted such a standard in the SELRA context. More importantly, the Department concedes that it did not ask the Board to adopt the standard in this case. We will not fault the Board for failing to adopt a new standard that it was not asked to consider in the proceedings before it. Cf. *Bull v. Pinkham Eng'g Assocs.*, 170 Vt. 450, 459, 752 A.2d 26, 33 (2000) (explaining that contentions not presented below are not preserved for appeal).

■ ■ ¶ 22. Matters pertaining to employee discipline clearly concern the employer-employee relationship and therefore must be bargained. The Board has ruled as much in the past, see *AFSCME Local 1201 v. City of Rutland*, 18 V.L.R.B. 189, 200 (1995), and neither party contends otherwise. It is also undisputed that the memorandum pertained to employee discipline. However, the Department argues that the memorandum merely restated standards already articulated in the collective-bargaining agreement and work rules. The memorandum did not merely restate

existing standards. The Department's distribution of the disciplinary memorandum set new disciplinary standards by prohibiting conduct not previously prohibited by the collective-bargaining agreement and work rules, and by attaching likely disciplinary outcomes to both new and existing prohibited conduct. Additionally, as the Board recognized, the memorandum unilaterally defined and broadened the circumstances under which employees could expect progressive discipline to be bypassed; the Department's unilateral action contravened the collective-bargaining agreement.

¶ 23. The memorandum contains at least one directive different in substance from requirements contained in the collective-bargaining agreement and work rules. The memorandum requires that employees "protect . . . inmate[s] . . . from physical or mental abuse by others." The Department's position, as the memorandum recites, is that work rules 1, 3, 6, and 9 already required employees to protect inmates from abuse. The Department is mistaken. Rule 6 prohibits an employee from *engaging* in abusive conduct, but does not require an employee to take action to stop such abuse by others. Rule 3 requires employees to *report* behavior that endangers the safety of others. While the Department insisted at oral argument that reporting physical or mental abuse is the first step in protecting them from that abuse, this argument aptly illustrates that the duty to protect is broader than the duty to report. Rules 1 and 9 are catch-all provisions prohibiting employees from violating collective-bargaining agreements, work rules, policies, procedures and directives, and from comporting themselves in a manner that reflects discredit on the Department. Neither rule says anything about physical or mental abuse, nor has the Department shown that employees are already required to actively protect inmates from physical or mental abuse by any provision of the collective-bargaining agreement or any other policy, procedure, or directive.

¶ 24. The Department's unilateral imposition of the requirement to protect inmates from abuse was impermissible. See *Vt. State Colleges Faculty Fed'n v. Vermont State Colls.*, 149 Vt. 546, 549, 547 A.2d 1340, 1343 (1988) (holding that the unilateral issuance of workload guidelines is an unfair labor practice where inconsistent with the collective-bargaining agreement); cf. *Burlington Fire Fighters Ass'n v. City of Burlington*, 142 Vt. 434, 436-37, 457 A.2d 642, 643-44 (1983) (holding that the employer committed an unfair

labor practice under MLRA where it unilaterally imposed regulations restating existing standards regarding hearings, disability and sick leave, and promotion and reward, but relaxed standards regarding uniforms).

¶ 25. Moreover, the memorandum changes the work rules by attaching disciplinary outcomes to the conduct prohibited therein. The only reference to discipline in the work rules appears in rule 10, which merely provides that conduct constituting a crime can be the basis for disciplinary action regardless of whether the employee is prosecuted or convicted. In the memorandum, however, the Department warns employees that the Department will "likely . . . impose severe disciplinary action up to and including immediate dismissal," for failure to adhere to the memorandum's requirements. This constitutes a second impermissible change in the standards governing employee conduct.

¶ 26. As the Board thoroughly analyzed, the memorandum's association of disciplinary outcomes with particular conduct also runs afoul of the parties' collective-bargaining agreement. Article 14 requires that disciplinary action be supported by just cause, and sets up a default procedure for implementing progressive discipline. Article 14 also recognizes that there are "appropriate cases" that warrant bypassing progressive discipline. While the parties negotiated the "appropriate cases" language, they never defined that term or enumerated the circumstances under which progressive discipline can be bypassed. Article 14 does not give the Department authority to unilaterally define what conduct will authorize a bypass of progressive discipline. The Board reasonably concluded that the memorandum constitutes such a unilateral definition in that it lists particular conduct as "likely" to result in severe discipline and directs employees to "expect" such to be the case.

¶ 27. On appeal, the Department argues that all the behaviors prohibited by the memorandum fit within one or more of the enumerated categories of misconduct justifying immediate dismissal under Article 14, § 2 and therefore present "appropriate cases" for bypassing progressive discipline. We disagree. Article 14 does allow the employer to dismiss an employee without the otherwise required two-week notice, or two weeks' pay in lieu of notice, for "gross neglect," "gross misconduct," "refusal to obey lawful and reasonable orders given by supervisors," "conviction of a felony," and "conduct which places in jeopardy the life or health

of a co-worker or of a person under the employee's care." However, it does not authorize the employer to unilaterally define what conduct falls within those contractual terms.

¶ 28. The Department has put forth a series of additional arguments as to why the memorandum was permissible. The Department maintains that there was essentially no change to existing standards because of how obvious it is that the conduct prohibited by the memorandum should be subject to severe discipline, and contends that the memorandum is saved from illegality by provisions of the memorandum expressly making it subject to the work rules and collective-bargaining agreement. The Department also argues that distributing the memorandum was a permissible expression of its views under Articles 2 and 17 of the collective-bargaining agreement,[2] and that circulating the memorandum for signature did not enhance employee accountability or result in a change in how the Department imposes discipline. For these reasons, the Department argues that its actions could not constitute an unfair labor practice. Finally, the Department notes that it must be permitted to notify employees of existing disciplinary standards or forgo discipline altogether. See *In re Gorruso*, 150 Vt. 139, 146, 549 A.2d 631, 636 (1988) (holding that an "employee must be on fair notice that his conduct could be grounds for dismissal" for there to have been just cause for discipline).

■ ¶ 29. We do not find any of these arguments persuasive. That the memorandum purported to be consistent with the work rules and collective-bargaining agreement does not make it so. Nor can the rights reserved to management in Articles 2 and 17 protect the Department from liability for distributing the memorandum; those management rights are expressly limited by the

---

[2] Article 2 provides, in pertinent part, that:

> [s]ubject to law, rules, and regulations, . . . and subject to terms set forth in this Agreement, nothing in this Agreement shall be construed to interfere with the right of the Employer to carry out the statutory mandate and goals of the agency, [or] to restrict the State in its reserved and retained lawful and customary management rights, powers, and prerogatives . . . .

As noted, Article 17 allows the Department to promulgate work rules that are consistent with the collective-bargaining agreement and the Department's statutory duty to bargain.

balance of the collective-bargaining agreement and by statute. We agree with the Board's conclusion that by disseminating the memorandum in the manner in which it did the Department changed disciplinary standards and asked employees to acknowledge those changes such that the Department could then hold employees accountable for them. The unfair labor practice was complete upon the unilateral distribution of the memorandum for signature. Finally, we do not disagree that the Department has the right to advise employees of the disciplinary standards that already exist in the collective-bargaining agreement and work rules, or that some conduct prohibited by the memorandum already merits summary dismissal under those standards — Article 14, § 3(d), for instance, already authorizes dismissal without notice for conviction of a felony. But when the Department wishes to notify employees of disciplinary standards different from or more specific than those already contained in the collective-bargaining agreement and work rules, it must fulfill its statutory obligation to bargain over the changes.[3]

¶ 30. Notwithstanding the fact that, as previously discussed, SELRA may offer employees broader protection than its federal counterpart, we note that the result we reach today is consistent with federal precedent. Under the NLRB's decisions, the Department's action would have been an unfair labor practice even if the memorandum did not add prohibited conduct to that covered by existing work rules and the collective-bargaining agreement. Un-

---

[3] In his concurring and dissenting opinion, our Brother Burgess suggests that the Board's decision and our decision stand for the proposition that "the Department can never immediately fire its employees for inexcusably serious, and even criminal, misconduct, unless the union first agrees." *Post*, ¶ 33; see also *post*, ¶ 32 ("Certainly the majority's application of the statute would not allow instant termination, without union agreement, of employees for supplying prisoners with weapons or for releasing inmates at their pleasure."). He misses the point entirely. First, this case is not about for what conduct the Department can and cannot summarily fire employees. Our decision does not undermine the provision in Article 14, § 3(b) authorizing the Department to summarily dismiss employees for "gross misconduct," for instance. Nor does it hamper the Department's ability to alert its employees that they can expect summary dismissal for gross misconduct. Rather, the gravamen of our decision is that the Department may not alter disciplinary standards prospectively without first bargaining with VSEA. Therefore, the Department may not purport to unilaterally define what constitutes "gross misconduct." Second, the Department is under a statutory obligation to *bargain* with VSEA over changes to disciplinary standards. As our Brother Burgess aptly illustrates, see *post*, ¶ 38, bargaining and agreement are not the same thing.

der federal law, merely communicating to employees that the range of discipline they can expect from certain infractions is narrower than previously expected — without requiring their signatures on a memorandum or making any changes to what conduct is prohibited — is an unfair labor practice. In *Sygma Network Corp.*, 317 N.L.R.B. 411, 415 (1995), the NLRB ruled that the employer committed an unfair labor practice where an existing handbook provided that an employee violating drug policies "will be subject to discipline up to and including immediate termination," and a new, unilaterally promulgated handbook provided that such an employee "will be subject to immediate termination." Furthermore, the NLRB has ruled that requiring employees to acknowledge existing production standards in writing is an unfair labor practice because such an action unilaterally creates greater accountability in addition to advising employees of existing standards. *Brimar Corp.*, 334 N.L.R.B. 1035, 1035-36 (2001).

¶ 31. In sum, nothing in our review of the record or the law counsels us against deferring to the Board's decision, and we therefore affirm it.

*Affirmed.*

¶ 32. **Burgess, J.**, concurring in part and dissenting in part. If, as the majority holds, it is "impermissible" under the State Employees Labor Relation Act (SELRA) for the Department to unilaterally require its officers to protect inmates from physical abuse, *ante*, ¶ 24, we are left to wonder why the Legislature would even call for the Department to hire, control, and supervise corrections officers at all, if not for the very purpose of protecting inmates and maintaining order within the facilities. The majority would apparently bar the Department from unilaterally requiring its officers to lock the cell doors or close a prison's gate on their way out. Certainly the majority's application of the statute would not allow instant termination, without union agreement, of employees for supplying prisoners with weapons or for releasing inmates at their pleasure.

¶ 33. The majority is correct insofar as some parts of the Department's disciplinary-guidance memorandum overstep the bounds of the collective-bargaining agreement. Other parts, however, clearly do not. Until today, it should have come as no surprise that corrections officers could be summarily fired for

smuggling narcotics to inmates, having sex with inmates, failing to protect inmates from attack, being convicted of a felony, being incarcerated, or ignoring orders to check on inmates at risk for suicide. Such misconduct so obviously violates an officer's fundamental duty, and is so inherently contrary to the Department's mission, that it requires no negotiation with VSEA either to be forbidden or to warrant instant termination from employment. Yet the Board held that the Department can never immediately fire its employees for inexcusably serious, and even criminal, misconduct, unless the union first agrees. Because some of the activities targeted for severe response by the Department fall well within its statutory rights to respond with immediate dismissal, as well as within the kinds of egregious misbehavior already subject to immediate dismissal under the contract, I dissent from the majority's wholesale affirmation of the Board's overbroad ruling.

¶ 34. To be sure, the Department was also overbroad, as well as overly vague, in its declared intent to bypass some bargained-for step discipline in an effort to address a myriad of potential employee misconduct that could lead to, or enable, conflicts of interests for officers, prisoner suicide, and abuse or discrimination against inmates. Indeed, not all of the infractions outlined in the memorandum necessarily deserve the summary dismissal threatened by the Department. The two examples noted by the Board and the majority, unlawful discriminatory actions and failure to honestly report an event, can easily occur in different degrees: neglect in reporting a minor incident is not the same as covering up a major violation; an insensitive comment or ignorant joke may not be as serious as a disciplinary focus on some prisoners based on ethnicity or race. Similarly, in the Department's quest to eliminate, and obligate its employees to affirmatively protect inmates from, the substantial harm of actual mental abuse, the line between mere teasing and bullying emotional mistreatment can be blurry.

¶ 35. Lesser misbehaviors under such categories of misconduct may be appropriately amenable to incremental discipline or remedial training. The disciplinary-guidance memorandum nevertheless purported to reserve to the Department the option of summary dismissal in any and all of those events. The majority properly concludes that such a unilateral declaration is inconsistent with the progressive discipline bargained for under Article 14.

¶ 36. At the same time, however, other infractions identified by the Department as likely to earn summary dismissal, like smug-

gling, sex with inmates, commission of felonies, incarceration, or failure to perform required inmate-safety checks, are so obviously impermissible and serious as to defy degree. These kinds of violations do warrant immediate firing — and without negotiating to do so. Moreover, the Department's warning that its officers could expect instant dismissal for such misconduct was entirely authorized by statute, and fully within the exceptions from bargaining set forth in Article 14. Notwithstanding the general provisions in Article 14 for progressive discipline and prior notice before termination, Part 3 of the article allows the Department to

> dismiss an employee immediately without . . . notice for any of the following reasons:
>
> (a) gross neglect of duty;
> (b) gross misconduct;
> (c) refusal to obey lawful and reasonable orders given by superiors;
> (d) conviction of a felony;
> (e) conduct which places in jeopardy the life or health of a co-worker or of a person under the employee's care.

Thus, neither SELRA, nor the contract, nor common sense, requires collective bargaining to label consorting sexually with prisoners, or passing contraband to them, as "gross misconduct." Nor was collective bargaining a prerequisite to appreciate that permitting physical abuse of a prisoner is either, or all, "gross neglect of duty," "gross misconduct," or jeopardizing to the prisoner's health. And given the dire consequence of noncompliance, no bargaining is necessary to identify disobedience of a suicide-watch order as a gross neglect of duty or failure to obey an order.

¶ 37. The majority concludes, instead, that such requirements and categories of misconduct are matters "relating to the relationship between" the Department and its employees and, as such, are subject to the general bargaining requirements of SELRA. 3 V.S.A. § 904(a). Declaring that the Department's unilateral direction that its officers protect prisoners from assault is impermissible, the majority supposes that the Legislature intended to abandon Vermont's prison population to the "law of the fang" unless otherwise agreed by VSEA. This construction of the statute

and contract is patently unreasonable. Further, it ignores specific statutory mandates to the Department and Commissioner to directly manage and control the operation and discipline of correctional facilities and correctional officers for the safety and wellbeing of those prisons and their inmates. See generally 28 V.S.A. §§ 101-102.

¶ 38. The majority's effort to distinguish "bargaining" from "agreement," *ante*, ¶ 29 n.3, is unavailing. In the majority's model, the obligation of correction officers for prisoner security and public safety is entirely dependent upon defining and enforcing those obligations to the satisfaction of the officers. In the absence of agreement, those topics of security and safety would then be referred to mediation and fact finding, or even legislative intercession, as necessary to resolve the impasse. See 3 V.S.A. § 925. Allowing the guards such influence and hindrance over the Commissioner's execution of the Department's basic statutory charge to keep inmates and facilities secure and safe makes no sense, and ignores the Department's authorizing legislation.

¶ 39. That these fundamental duties of the Department are *not* subject to collective bargaining is recognized by the express exclusion of "those matters which are prescribed or controlled by statute" from collective bargaining under SELRA, 3 V.S.A. § 904(a), and the contract's own terms. Article 2 of the contract states that:

> nothing in this Agreement shall be construed to interfere with the right of the Employer to carry out the statutory mandate and goals of the agency, to restrict the state in its reserved and retained lawful and customary management rights, powers, and prerogatives, including the right to utilize personnel, methods and means in the most appropriate manner possible.

The powers and responsibilities of the Department and its Commissioner over its employees are detailed in Title 28. The Department is charged, in pertinent part:

> (1) To establish, maintain and administer . . . correctional facilities . . . for the safekeeping of . . . persons as may be committed to the department in accordance with law;
>
> . . . .

(4) To employ such officers, employees and agents as deemed necessary to discharge the functions of the department;

(5) To establish standards for the management, operation, personnel and program of all correctional facilities in the state . . . .

28 V.S.A. § 101. The Commissioner is charged, in turn:

(1) To make rules and regulations for the governing and treatment of persons committed to the custody of the commissioner, the administration of correctional facilities and the regulation of employees under the jurisdiction of the commissioner.

. . . .

(5) To prescribe rules and regulations for the maintenance of discipline and control at each correctional facility.

(6) To maintain security, safety and order at the correctional facilities and act to subdue any disorder . . . which may occur at any facility. . . .

28 V.S.A. § 102(c).

¶ 40. The Legislature's delegation to the Department and to the Commissioner of constant direction and control over security, order, safety, and discipline of facilities, staff, and inmates is not a topic for bargaining. So designated as exclusively responsible for inmate safety and facility security, the Department and its Commissioner cannot then subject its decisions in this regard to the agreement or disapproval of its employees. It is axiomatic that the safekeeping of prisoners, exclusion of contraband, prohibition of sexual fraternization, elimination of conflicts of interest, and the discipline of officers failing to execute the fundamental prerogatives and responsibilities of the employer are not a subject of negotiation. 3 V.S.A. § 904(a); Collective Bargaining Agreement, Article 2, part 1. Accordingly, the majority's conclusion that the Department cannot expect and require its officers to intervene against harm to inmates by others, without first negotiating for such protection, is untenable.

¶ 41. Equally indefensible is the notion that conflicts of interest, sexual liaisons with prisoners, delivery of contraband to prisoners,

and the continued employment of staff who achieve felon or inmate status themselves cannot be prohibited, nor made grounds for immediate dismissal by the Department, without the agreement of the union. Quite contrary to the majority's redelegation of the employer's statutory authority to VSEA, the Legislature granted no voice to the union, and certainly no veto, over those parts of the Department's memorandum pertaining to immediately disqualifying standards for staff, and immediately enforceable measures for the most basic physical protection of prisoners and elementary security of prisons. The majority's holding plainly infringes on the explicit authority of the Department and Commissioner "[t]o establish standards for the management, operation, personnel and program of all correctional facilities," 28 V.S.A. § 101(5), and "[t]o maintain security, safety and order at the correctional facilities," id. § 102(c)(6).

¶ 42. It is important to note, at this juncture, that the Department's right and obligation to define the fundamental obligations of its officers, and its own summary response to disobedience to those essential duties, in no way subverts employees' contractual rights to be terminated only for good cause. The memorandum cannot curtail the Board's jurisdiction to adjudge, upon the filing of a grievance, that the good cause claimed for immediate termination, or termination at all, cannot be sustained by the employer. It may be that, after full hearing, a summary firing cannot ultimately be justified as a matter of law, or that the Department cannot prove the infraction charged as a matter of fact. Such claims are properly reserved by statute for the Board's review in the first instance. 3 V.S.A. §§ 902(14), 926.

¶ 43. The Board's order should not be affirmed in its entirety, but reversed in part as necessary to defer to the Department's statutory authority to set facially reasonable minimum performance expectations, and facially reasonable sanctions for infractions of such standards. The memorandum's warning to corrections personnel that passing contraband to inmates, engaging in sexual relations with prisoners, failing to protect prisoners, committing felonies, and incarceration will not be tolerated from staff is entirely within the Department's legislative mandate. I respectfully dissent from the majority's determination that it is an unfair labor practice for the Department to protect inmates from suicide and physical attack, or to forbid its employees from introducing contraband to, and from engaging in sex with, the prison popu-

lation, or to immediately dismiss from its staff felony offenders
and persons serving prison sentences.

¶ 44. I am authorized to state that Chief Justice Reiber joins in
this partial dissent.

Appendix I

## ARTICLE 14
## DISCIPLINARY ACTION

1. No . . . employee covered by this agreement shall be disciplined
without just cause. The parties jointly recognize the deterrent
value of disciplinary action.
Accordingly, the State will:

. . . .

(b) apply discipline or corrective action with a view
toward uniformity and consistency;

(c) impose a procedure of progressive discipline or pro-
gressive corrective action;

(d) In misconduct cases, the order of progressive disci-
pline shall be:

(1) oral reprimand;

(2) written reprimand;

(3) suspension without pay;

(4) dismissal.

(e) in performance cases, the order of progressive cor-
rective action shall be as follows:

(1) feedback, oral or written . . .

(2) written performance evaluation . . .

(3) warning period . . .

(4) dismissal.

(f) The parties agree that there are appropriate cases
that may warrant the State:

(1) bypassing progressive discipline or corrective
action;

. . . .

2. [The State] may dismiss an employee for just cause with two (2) weeks' notice or two (2) weeks' pay in lieu of notice. . . .

3. Notwithstanding the provisions of paragraph 2 above, [the State] . . . may dismiss an employee immediately without two (2) weeks' notice or two (2) weeks' pay in lieu of notice for any of the following reasons:

(a) gross neglect of duty;

(b) gross misconduct;

(c) refusal to obey lawful and reasonable orders given by supervisors;

(d) conviction of a felony;

(e) conduct which places in jeopardy the life or health of a co-worker or of a person under the employee's care.

Appendix II

## ARTICLE 17
## AGENCY, DEPARTMENT AND INSTITUTION WORK RULES

### 1. ESTABLISHMENT OF RULES

(a) [The Department] shall put into writing those rules of conduct and procedure it deems necessary for its efficient operation. . . .

(b) [Work rules] shall not be in conflict with existing law, [or] contract provisions . . . .

(c) Work rules shall relate to aspects of employment (such as Public Safety work rules outlining proper maintenance schedules for cruisers, AOT rules for use of State-owned property and equipment), and not to fundamental conditions of work which give rise to a statutory bargaining obligation.

### 2. NOTIFICATION AND DISTRIBUTION OF RULES

(a) All employees affected by the . . . work rules must be notified in writing . . . of those rules and changes to those rules at least fifteen (15) days prior to the date they become effective . . . .

(b) The State shall provide written notification to the VSEA of all new rules and changes to existing rules concurrent with the notice to employees.

. . . .

## 3. REASONABLENESS AND APPLICATION OF RULES

(a) An employee or the VSEA may grieve the reasonableness of any rule promulgated under this Article . . . .

Appendix III

## DEPARTMENT OF CORRECTIONS
### WORK RULES

1. No employee shall violate any provision of the collective bargaining agreement or any State or Department work rule, policy, procedure, directive, local work rule or post order.

. . . .

3. No employee shall, while on duty or on State property, endanger the safety of any member of the public. Employees shall be responsible to promptly report, to their immediate supervisor, any such conduct by another employee, volunteer or offender which endangers the safety of others.

4. Employees shall be honest and complete in their descriptions, whether given orally or in writing, to the employer of events occurring in the work place and in all other circumstances related to their employment.

5. Employees shall cooperate fully with any inquiry or investigation, whether formal or informal, conducted by the Department. This shall include answering fully and truthfully any questions related to their employment.

6. No employee shall, while on duty or engaged in an activity associated with the Department of Corrections, engage in verbal or physical behavior towards employees, volunteers or members of the public, which is malicious, demeaning, harassing or insulting. Such behaviors include, but are not limited to: profane, indecent or vulgar language or gestures, actions or inactions which are rude (such as ignoring a visitor who attempts to gain entrance to the building) or treating inmates in a demeaning manner with no legitimate rehabilitative justification. No employee shall exhibit behaviors which are physically or mentally abusive towards offenders.

7. No employee shall engage in a sale or lease of property to or from an offender, hire offenders for work or provide services or goods to offenders, except with the permission of supervisory authority. No employee shall lend money to or borrow money from an offender or accept gifts or gratuities from and give gifts or gratuities to an offender.

. . . .

9. No employee, whether on or off duty, shall comport himself or herself in a manner that reflects discredit upon the Department.

10. No employee, whether on or off duty, shall violate any law or ordinance. Any conduct constituting a felony or misdemeanor can be the basis for disciplinary action whether or not prosecution or conviction results. A formal adjudication of felonious or misdemeanant behavior is not necessary before a decision to discipline is made.

. . . .

13. Romantic and/or sexual relationships between employees and offenders under any type of Department control or supervision are strictly prohibited. Actions are also prohibited which, in the opinion of the appointing authority, give the appearance of an improper relationship between an employee and an offender. These include, but are not limited to: hugging, kissing, hand-holding and unofficial correspondence. Employees, while on duty, on State property or while otherwise associated with State business, shall conduct themselves in a professional manner in their interactions with co-workers.