**In re Grievance of Norma BARNEY,**
**Brenda Chamberlain, and Sgt. Gloria**
**Danforth (Department of Public**
**Safety, Appellant)**

[772 A.2d 1074]

No. 99-538

March 1, 2001. This is an appeal from a decision of the Labor Relations Board finding that grievant, Detective Sergeant Gloria Danforth,* was discriminated against by the Department of Public Safety because she was suspected of making public allegations of state police impropriety. The Board sustained the grievance under Article 53 of the State Police Bargaining Unit contract, which protects state employees from retaliation because of whistle blowing activities. The State does not appeal the finding of discrimination, but takes issue solely with the Board's interpretation of Article 53. The Board interpreted Article 53 to require protection against retaliation for whistle blowing whether or not the State knew or merely suspected that the employee had been responsible for public criticism of the Department. We affirm.

The Board's findings show that grievant made an internal complaint that false time sheets were being signed by the station commander of the Bethel barracks, Lt. Bruce Lang, on behalf of a custodial employee who was in the hospital. The time sheets were sent to the Department of Buildings, which actually employed the custodian. Grievant learned of this from Norma Barney, a dispatcher, and complained within the chain of command. There was no action on grievant's complaint, and thereafter Barney notified the Department of Buildings of the false time sheets. The Department of Public Safety began an internal investigation into Lang's conduct. In the meantime, Lang was transferred to the St. Johnsbury barracks and Lt. Glen Cutting was named station commander of the Bethel barracks. By this time, Barney had filed a grievance alleging retaliation for her complaint.

---

* There were originally three grievants, two of whom settled their claims with the Department prior to the conclusion of the hearing.

The grievance and the facts underlying the Public Safety investigation came to the attention of a local newspaper, the Valley News, and a reporter called the barracks for comment. Although Lt. Cutting did not know who had notified the press, he suspected Danforth, among others. The Labor Board found that immediately after Cutting talked to the reporter, Danforth's working conditions changed to her detriment, and that the change was motivated by Cutting's belief that she had publicized the facts underlying the internal investigation. In fact, the Labor Board found that Danforth had not done so and that Cutting's actions were based on mere suspicion.

Article 53 provides:

> A "Whistle Blower" is defined as a person covered by this Agreement who makes public allegations of inefficiency or impropriety in government. No provision of this Agreement shall be deemed to interfere with such an employee in the exercise of his or her constitutional rights of free speech, and such person shall not be discriminated against in his employment with regard thereto.

The Board noted that, ordinarily, it has held that allegations of impropriety made within the chain of command and not published beyond the employer do not come within the protection of Article 53, but it recognized that this case presented a somewhat different issue from past cases. While previous cases centered on whether an allegation was public, publicity is not the issue here. The Labor Board found that it was only after the reporter for the Valley News telephoned Lt. Cutting and revealed what she knew about the Lang investigation that Cutting took action against Danforth. In other words, it was the publicity of the charges, not the charges themselves

which had been pending internally for some time, that prompted the retaliation.

The Board decided that its decision turned on the motive of the employer in carrying out retaliation against the grievant based on its suspicion that she was a whistle blower. Ultimately, the Board's interpretation of the contract was guided by numerous federal cases that have held that whistle blowing employees are protected from adverse actions by their employers even if the adverse action is based on mere suspicion rather than actual knowledge. See *Reich v. Hoy Shoe Co.*, 32 F.3d 361, 368 (8th Cir. 1994) (Secretary of Labor not required to show employer's actual knowledge; mere suspicion or belief is enough); *NLRB v. Richie Mfg. Co.*, 354 F.2d 90, 98 (8th Cir. 1966) (adverse action based on mere belief that terminated employee was union activist was sufficient to establish violation); *Brock v. Richardson*, 812 F.2d 121, 125 (3d Cir. 1987) (erroneous belief that employee engaged in protected activity was sufficient to protect employee from discharge under Fair Labor Standards Act); *Donovan v. Peter Zimmer America, Inc.*, 557 F. Supp. 642, 652 (D.S.C. 1982) (discharge of three employees motivated in part by employer's inability to pinpoint which one of them filed OSHA complaint sufficient to protect all three from retaliation for protected activities). None of the statutes involved in the above-cited cases had explicit protection for suspicion of whistle blowing. In each case, the court was required to interpret the whistle blowing provisions as impliedly covering adverse action based on suspicion as well as actual knowledge. The Board was persuaded by the reasoning of these cases, as well as others, quoting from *Reich*:

> It is beyond question that employers make employment decisions based upon what they actually know to be true. Likewise, common sense and exper-

ience establish that employers also make employment decisions on what they suspect or believe to be true. It would be a strange rule, indeed, that would protect an employee discharged because the employer actually *knew* he or she had engaged in protected activity but would not protect an employee discharged because the employer merely *believed* or *suspected* he or she had engaged in protected activity.

32 F.3d at 368 (emphasis in original).

Giving the Board the deference to which it is entitled in its interpretation of collective bargaining agreements, *In re VSEA*, 164 Vt. 214, 216, 666 A.2d 1182, 1183 (1995), we agree with grievant that the Board's interpretation of Article 53 is reasonable. The underlying purpose of Article 53 is to permit employees to expose wrongdoing on the part of state officials without fear of retaliation by the State. This case presents precisely the kind of improper reaction to publicity that Article 53 is intended to prohibit. The State's contention that where state officials are mistaken in their belief that an employee has made public allegations of impropriety, the parties to the contract intended no protection from retaliation, is plainly inconsistent with that purpose.

Moreover, the State concedes that a laudable outcome of Article 53 is that employees will be motivated to expose impropriety and inefficiency. But, applying the State's interpretation of the contract would have a chilling effect on the motivation of any employee to expose public wrongdoing. The Labor Board found that Danforth had not made the allegations public, but that there was no proof of which employee, if any, had called the Valley News. Under the State's theory, therefore, retaliation against everyone in the barracks would not violate Article 53. It is difficult to conceive how employees will be motivated to expose wrongdoing if

any perceived association with public complaints, no matter how tenuous, will leave them subject to retaliation. The better interpretation of Article 53, if it is to have any effect at all, is that the State is responsible for its improper motive and actions, whether or not it undertook the action upon actual facts or mere suspicion.

The State's reliance on *In re Robins*, 169 Vt. 377, 737 A.2d 370 (1999), is misplaced. There, as here, grievant alleged that his employer had violated the whistle blower provisions of the contract. The Board declined to consider what was a long-standing internal dispute over sludge disposal standards as sufficiently public to invoke the whistle blower provision. Thus, our brief discussion of the whistle blower provision was over the nature and degree of publicity given to the dispute. *Id.* at 385-86, 737 A.2d at 375-76. We agree with the Board that the instant case is not about whether the allegations were public, but how the State, as employer, dealt with the exposure of the allegations.

Finally, the State's other arguments against the Board's interpretation do not persuade us. It argues that the Board should not have relied on federal cases construing statutory provisions that are essentially remedial in nature and subject to a broad construction. The State is correct that the interpretive task is to determine the intent of the parties from the language expressed. See *Hamelin v. Simpson Paper Co.*, 167 Vt. 17, 19, 702 A.2d 86, 88 (1997). As we read the decision, however, the Board was guided by the logic of the federal cases, which were closely analogous on the facts, rather than on the principles of statutory construction that were applied. We cannot conclude that the distinguishing features of the federal cases undermined the Board's common sense interpretation of Article 53.

*Affirmed.*