2014 VT 56

# In re Grievance of VSEA
## (Tropical Storm Irene Emergency Closing)

[99 A.3d 1025]

No. 13-316

Present: **Reiber, C.J., Dooley, Skoglund and Crawford, JJ., and Pineles, Supr. J. (Ret.), Specially Assigned**

Opinion Filed June 20, 2014

*Rebecca McBroom*, Vermont State Employees' Association, Montpelier, and *Alfred Gordon O'Connell* of *Pyle Rome Ehrenberg PC*, Boston, Massachusetts, for Appellants.

*William H. Sorrell*, Attorney General, and *Bridget C. Asay*, Assistant Attorney General, Montpelier, for Appellee.

¶ 1. **Dooley, J.** Vermont State Employees' Association (VSEA) appeals a decision of the Vermont Labor Relations Board, which found that the State of Vermont was not required to give certain compensation to state employees in the weeks and months following Tropical Storm Irene. VSEA contends that the Board erred in interpreting certain terms of the emergency closing provision of the collective bargaining agreements between the State and VSEA. We affirm.

¶ 2. On Sunday, August 28, 2011, Tropical Storm Irene passed through Vermont, causing massive flooding throughout the state. The storm had a particularly devastating effect on the complex of state buildings in Waterbury.[1] The Waterbury complex housed the Agency of Human Services, the Agency of Natural Resources and the Department of Public Safety.[2] The complex lies near the Winooski River, which overflowed its banks and entered the buildings in the complex, rendering most of them unusable to this day.

¶ 3. Governor Peter Shumlin authorized the complete closure of Vermont state government on Monday, August 29. The closure

---

[1] The storm also resulted in the closing of the Department of Motor Vehicles office in Rutland, and the compensation rights of employees working at that office are also involved in this case. The evidence and the Board's findings with respect to these workers were limited. As a result, we have not discussed them in the text. Our holding with respect to employees that worked in the Waterbury complex applies equally to these DMV workers.

[2] The Department of Public Safety was ultimately able to return to the Waterbury complex but the other agencies were not.

notice stated that only authorized critical staff persons should report for work. That total government closure was authorized for only one day.

¶ 4. In the days that followed, various work arrangements were necessary because the Waterbury complex was generally unusable. The Vermont Department of Human Resources (DHR) indicated that agencies with offices in the complex had implemented their Continuity of Operations Plans (COOP). These plans allow only specifically authorized critical staff to work in order to continue an agency's essential functions during and immediately following an emergency situation. All other employees in the complex were instructed that they "should not report to work unless specifically authorized to do so by a supervisor."

¶ 5. Eventually, most of the state employees in the complex were assigned to new work stations as agencies moved their operations. At first, there was uncertainty about the work requirements and compensation for state employees who had worked in the complex. Over time, management reached a position on those policies. The position was unacceptable to VSEA, the union that represents the state's classified employee workforce. VSEA charged that the State's position was inconsistent with three collective bargaining agreements as well as a state personnel policy. When the parties could not resolve the conflict, VSEA appealed to the Vermont Labor Relations Board. Three different contracts between VSEA and the State are implicated in this case: (1) the Non-Management Unit Bargaining Contract effective July 1, 2010 to June 30, 2012; (2) the Supervisory Bargaining Unit Contract effective July 1, 2010 to June 30, 2012; and (3) the Corrections Bargaining Unit Contract effective July 1, 2010 to June 30, 2012. The three contracts share many of the same articles. Pertinent portions of these contracts relate to emergency closings, location reassignments, and various types of compensation.

¶ 6. The emergency closing article,[3] which is substantially the same in all three contracts, provides:

> 1. Management shall decide when, if, and to what extent State facilities shall remain open

---

[3] The emergency closing provision is found at Article 44 of the Non-Management Unit Contract, Article 48 of the Supervisory Unit Contract, and Article 49 of the Corrections Unit Contract.

or closed during emergencies, such as adverse weather conditions, acts of God, equipment breakdown, inoperable bathroom facilities, extreme office temperatures, etc.

. . . .

3. In facilities that must remain operational despite emergency conditions, continued operations with a reduced work force may be authorized. In such instances, employees who are authorized to leave work early may do so without loss of pay or benefits. Employees who are required to remain at work shall receive compensatory time at straight time rates.

4. An employee who is unable to report to work due to weather or other emergency conditions shall have the absence charged against accumulated compensatory time or annual leave, in that order.

5. If management authorizes the complete closing of a State office or facility for emergency reasons, employees who leave the workplace shall receive their regular pay for time they are out of the closed office.

6. Employees required by management to work during complete emergency closings under (5) above, shall receive hourly pay at straight time rates for the hours so worked. This payment will be in addition to the employees' regular pay.

¶ 7. The employee workweek/work location/work shift[4] provision, Article 20 of all three contracts, indicates in part:

3. **SELECTION FOR ASSIGNMENT TO A NEW SHIFT/ NEW WORKWEEK/NEW GEOGRAPHIC AREA**

---

[4] The language of the article is the same in each contract unless otherwise noted. The slight variations in Article 20 among the three contracts do not affect our decision.

(a) Subject to the operating needs of a Department, as determined by the appointing authority, which may require the assignment (for fifteen (15)[5] days or more) of any employee to a different or new shift, workweek, or geographic area, the State will select qualified volunteers first, after which selection shall be in reverse order of (continuous State service) seniority, i.e., the most junior employee(s) will be selected.

. . . .

(c) The State will give two (2) weeks' prior notice of any such assignment to a new shift or new workweek, or four (4) weeks prior notice in the case of an assignment to a new geographic area,[6] and will try to accommodate those persons who need extra time to make the change or move. The State will also try to give additional notice of such changes or moves if feasible.

¶ 8. A "geographic area" is defined in the contracts as "the area within a thirty-five (35) mile radius of an employee's regular duty station." A "duty station" is not defined. "Official notice" is defined as "written communication from the appointing authority to an employee."

¶ 9. The annual leave[7] provision reads:

(n) Vacation scheduling is the exclusive prerogative of the appointing authority. Leave must be requested in advance by the employee and is subject to approval by the appointing authority or his or her delegated representa-

---

[5] The Supervisory Unit Contract and the Corrections Unit Contract provide for "thirty (30) days" here instead of "fifteen (15) days."

[6] The language reading "to a new shift or new workweek, or four (4) weeks prior notice in the case of an assignment to a new geographic area," only appears in the Non-Management Unit Contract.

[7] The annual leave provision is found in Article 30 of the Non-Management Unit Contract, Article 34 of the Supervisory Unit Contract, and Article 34 of the Corrections Unit Contract. The language of the article is substantially the same in each contract.

tive. Such approval shall not be unreasonably withheld . . . .

   (o) An employee shall not be charged annual leave for absence on a legal holiday or on an administrative holiday.

¶ 10. The State Personnel Policy Number 11.3 also provides direction regarding emergency closings as follows:

## PURPOSE AND POLICY STATEMENT

There are occasions when management must decide if and to what extent State facilities should remain open or be closed during emergencies such as adverse weather conditions, acts of God, equipment breakdown, inoperable bathroom facilities, extreme office temperatures, etc. This policy clarifies who has the authority to make such decisions, and under what circumstances.

## GENERAL INFORMATION

The following defines the different types of emergency closing situations that may arise and specifies who has authority to close a State office or facility.

. . . .

### 2. Complete Closing:

The Secretary of Administration may authorize the complete closing of a State office or facility for emergency reasons. In these situations, State offices are closed for business.

Employees who leave the workplace in these situations will receive their regular pay for the time that they are out of the closed office without charging to any leave balances.

Employees who are **required** by management to work during a complete emergency closing will receive **cash for all hours worked while the office or facility is closed, in addition to** the employee's regular pay. This does not apply to exempt, managerial, confidential, and temporary employees.

. . . .

## COMPENSATION FOR EMPLOYEES

Employees who are on authorized annual leave, sick leave, personal leave, compensatory time off, or on other paid leave, will not be charged leave time for the period of the emergency closing. The same provisions apply to delayed openings, early closing, or reduced work force situations.

¶ 11. Although this dispute has many facets, as discussed below, the emergency closing articles in the three contracts are at its center. For employees at the Waterbury complex and the Rutland DMV office, VSEA argues that sections 5 and 6 of the emergency closing article applied not just on August 29, the day that the Governor closed state government, but for each day thereafter until the employee's work location was changed pursuant to Article 20. Thus, VSEA argues that management authorized "the complete closing of [the Waterbury complex and Rutland DMV office] *for emergency reasons."* (Emphasis added.) As a result, VSEA argues that all workers were entitled to receive regular pay during that period and those who were required to work during the closing were entitled to double pay, irrespective of where they worked. The State responds primarily that the closing occurred because of an emergency on August 29, but thereafter the office closings were not the result of an "emergency" as the term is used in the contracts. Thus, it argues sections 5 and 6 of the emergency closing articles do not give VSEA the relief it seeks.

¶ 12. Between August 30 and September 7, 2011 the State and VSEA unsuccessfully attempted to reach an agreement regarding payment for Waterbury complex employees who worked at alternate worksites. On April 16, 2012, VSEA filed its grievance with the Board. VSEA argued that the State had violated several provisions of the collective bargaining agreements as well as Personnel Policy 11.3. Specifically, it alleged in relevant part that the State (1) violated the emergency closing article, sections 5 and 6, and Personnel Policy 11.3(2), by failing to pay compensation in addition to regular pay to employees who were required to work during the emergency closing, even though employees who were not required to work received their regular pay for this time; and (2) violated the sick leave and annual leave articles and applied Personnel Policy 11.3 in a discriminatory manner by requiring certain employees to use accrued leave while their worksites were

closed as a result of damage from Tropical Storm Irene, while not requiring other employees to use their accrued time even though those employees were not required to work and were receiving regular pay.[8] The State responded on May 14, 2012, denying that it had violated any provisions of the agreements or misapplied Personnel Policy 11.3.

¶ 13. The Board granted the parties' joint request to bifurcate the hearings. In the initial hearings, the Board would consider whether the alleged violations of the agreements occurred. If the Board found that violations had occurred, it would hold remedy hearings to determine the amount owed to each grievant. The Board held the initial hearings and each party submitted post-hearing briefs. The Board issued its opinion on July 8, 2013. On all issues relevant to this appeal, the Board found that the State had not violated the agreements or misapplied Policy 11.3.

¶ 14. The Board determined that state employees received their regular ·pay if they were required to work at alternate locations due to damage caused by Tropical Storm Irene and that the State compensated employees for mileage, lodging, and travel time incurred by working at alternate locations prior to a change of their official duty station. It determined that employees also received regular pay if their assigned duty station was the Waterbury complex, and they were not required to work following the storm. The Board added that in order to receive their regular pay, these employees were expected to remain available to report to work in case they were needed. It stated that the State assigns all its employees to an official duty station and that the State could change this assignment by informing the employee. The Board concluded that requiring an employee to work at an alternate location for a temporary period does not change the employee's official duty station.

¶ 15. Looking at the language of the emergency closing article, the Board stated that "[a]n emergency typically would be of relatively short duration, and it would be an unfair and unreasonable interpretation of the Contract to conclude that the parties

---

[8] VSEA also alleged that the State violated the work location article by retroactively relocating employees' assigned worksites. VSEA has not raised the Board's resolution of, this here, and we have not considered this claim.

VSEA also claimed that the State violated Article 6 by failing to provide requested information to VSEA in a timely manner. The Board agreed with VSEA on this issue, and the State has not appealed.

intended that the State would be obligated to pay employees double pay for any work performed pursuant to the Emergency Closing article for several weeks absent explicit wording in the Contract so providing." It added: "There is no indication in the language of the Contracts, bargaining history or past practice that the parties intended a link between the Emergency Closing article and the Work Location article of the Contracts. We are not inclined under these circumstances to interpret the Contracts to provide such a link."[9]

¶ 16. As an alternative rationale, the Board reasoned that a "complete closing of a State office or facility" in section 5 of the emergency closing article means the complete closing of "the operations of a state department or agency" because any other interpretation would hinder state agencies from carrying out their mission "without an excessive drain on State funds."[10]

¶ 17. The Board determined that a complete closing for emergency reasons did not continue after August 29. It found "operations of state agencies and departments partially resumed on August 30 and there was a movement that day and the days immediately following towards a resumption of normal operations. State operations were open for business to resume the carrying out of the missions of affected agencies and departments."

¶ 18. In response to VSEA's claim that paying employees who continued working the same, regular pay as those who were not required to work was unfair, the Board noted that those employees who would receive double pay for working under VSEA's view of the agreements would in some cases be working alongside employees who would not be receiving double pay, causing different equity concerns. It also noted that thousands of state employees — those not working in the Waterbury complex — would receive regular pay.

¶ 19. The Board further rejected VSEA's claim that the State violated the sick and annual leave articles because that claim also

---

[9] The Board also noted that VSEA made no argument under section 3 of the emergency closing article and, therefore, did not consider that section. VSEA has also made no argument based on section 3 here.

[10] The Board rejected another alternative rationale argued by the State — that the State has unreviewable discretion under the agreements to determine when there is a complete closing and when employees are entitled to additional compensation. The State has also argued that position here, but we do not reach it.

rested on a determination that there was an emergency closure after August 29, 2011.

¶ 20. On appeal, VSEA contends that the State (1) should have paid employees who worked during the emergency closing double pay and (2) should not have required some employees to use leave while they were not working, while others were not required to use leave.

¶ 21. Our main task in this appeal is to review the Board's interpretation of terms of the collective bargaining agreements between VSEA and the State. We do so under a deferential standard of review. *In re Rosenberg*, 2010 VT 76, ¶ 12, 188 Vt. 598, 11 A.3d 651 (mem.) ("We accord substantial deference to the Board's construction of collective bargaining agreements." (quotation omitted)); *Vt. State Emps. Ass'n v. State*, 2009 VT 21, ¶ 19, 185 Vt. 363, 971 A.2d 641 ("We give substantial deference to the Board in decisions that lie within its area of expertise, and presume its decisions are correct, valid and reasonable. This deference extends to the Board's interpretation of employment contracts . . . ." (citations omitted)).

¶ 22. We also review the factual findings of the Board. "We will uphold the Board's findings so long as credible evidence fairly and reasonably supports them, even if we would not have reached the same decision. Such findings will stand even if there exists substantial evidence contrary to the challenged findings." *In re Lilly*, 173 Vt. 591, 592, 795 A.2d 1163, 1167 (2002) (mem.) (citations omitted). We reverse only if the Board's findings of fact are clearly erroneous. *In re Jewett*, 2009 VT 67, ¶ 25, 186 Vt. 160, 978 A.2d 470.

¶ 23. ■ Traditional principles of contract law govern the construction of collective bargaining agreements. *In re West*, 165 Vt. 445, 450, 685 A.2d 1099, 1103 (1996). Our goal in construing a contract is to determine the intention of the parties and implement it. *In re Gorruso*, 150 Vt. 139, 143, 549 A.2d 631, 634 (1988); see also *In re Barney*, 172 Vt. 530, 533, 772 A.2d 1074, 1077 (2001) (mem.) (recognizing that our task is to determine the intent of the parties from the language expressed). We interpret a contract in its entirety. *In re West*, 165 Vt. at 450, 685 A.2d at 1103.

¶ 24. ■ In this case, the parties have sparred on our law with respect to whether the agreements are ambiguous and if so, the effect of that ambiguity. See *Towslee v. Callanan*, 2011 VT 106,

¶ 5, 190 Vt. 622, 55 A.3d 240 (mem.) (stating that a contract term is ambiguous if reasonable people could differ as to its interpretation, and that the court should look beyond the plain language to discern the parties' intent only if the contract is ambiguous). This distinction makes little difference in this case because neither party offered extrinsic evidence helpful in determining the intent of the parties with respect to the contractual issues before us. Thus, we must rely on the language of the agreements to determine the intent of the parties.

¶ 25. We note at the outset that there is no dispute that an emergency situation occurred when flood waters of the Winooski River entered the Waterbury complex buildings on August 28, 2011. The difficulty that divides the parties is when the controlling consequences of that emergency situation or the emergency itself ended. They have taken two fundamentally different positions with respect to that issue and, in the process, divided it into two related questions, as we discuss below.

¶ 26. The first question is whether the State's compensation obligations under section 6 of the emergency closing article ended when the emergency was over. On this question, the Board described the VSEA position:

> [E]mployees in these offices were required to be paid double time for any work they performed from August 29 until these employees' offices were no longer closed. Grievants assert that their offices were no longer closed under the Emergency Closing article when the State issued relocation notices to them assigning them to a new duty station.[11]

This position is based on the language of section 5 and the fact that there was a complete closing of all offices and facilities in the Waterbury complex on August 29, that employees left their workplace, and that these employees were "out of the closed office" at least until they were assigned to a new work location. Under this construction, it is irrelevant when the emergency situation ended as long as there was one in the beginning — that

---

[11] VSEA's brief is long on negative rhetoric to describe the Board's motives for its decision and short on stating precisely VSEA's position for this appeal. For that reason, we have used the Board's description of VSEA's position. It is consistent with our reading of the record. As a general observation, we found VSEA's rhetoric not to be helpful.

is, as long as an employee is working and is out of an assigned office because of the flooding, the employee is entitled to double pay. We might call this a "causation" construction of section 5.

¶ 27. VSEA's construction of the language requires a particular view of the intent of the drafters. In VSEA's view, the intent was to ensure that employees who performed work for the state during the period they were out of their regular offices receive compensation for that work above and beyond what they would have received had they performed no work. Thus, since many employees were paid their normal compensation without performing work for the state because there was no space available for them, VSEA argues that the employees who did work must be doubly compensated even if they did exactly the same work as they did before the storm.

¶ 28. The State, on the other hand, reads section 5 as applicable only during a period of emergency and not thereafter even if employees cannot return to their normal place of work because of the damage caused during the emergency. Thus, the State argues that there was no "closing of a State office or facility for emergency reasons" after August 29 and therefore section 5 does not apply after August 29. Contrary to VSEA's position, the State views the day on which the emergency ended as not only relevant but determinative.

¶ 29. Consistent with its construction, the State sees a very different intent behind the language. It asserts that employees who work during an emergency are generally doing different work during the emergency than normal and that the work may be strenuous and even dangerous because of the presence of the emergency situation. In those circumstances, the State asserts that the policy of the emergency closing article is to provide the employees who work during the emergency extra compensation for that unusual work. Once the employees return to their normal work, however, the State asserts they are no longer entitled to extra compensation.

¶ 30. ■ We conclude that both constructions of the language of the article are plausible, but that the State has the better argument on the intent of the article. There are three aspects of VSEA's argument we find troubling. First, it is based on the logic that a windfall for some workers — those who do not have to work to be compensated — must result in a windfall to others —

those who do work. This is particularly troubling where the work performed is the same as that done by others — those who never worked in the Waterbury complex and do not receive the windfall. Second, VSEA's argument is based on correcting a form of discrimination — between those who work and those who do not — that is arguably true here but may not be true in other circumstances. Thus, if everyone in an office in the Waterbury complex had been called to work in a temporary location, the VSEA position would require that they all receive double pay even though no one in the office was receiving regular pay while not working. Finally, as emphasized by the State, the result of VSEA's argument is that employees who do work automatically receive two or four weeks of double compensation under the work location article because they are entitled to that much notice to be moved to a new permanent work location.

¶ 31. We do not see similarly troubling aspects in the State's position on the drafters' intent. While the time at which the employees' entitlement to double compensation ends under the State's position is more arguable, it is nonetheless still ascertainable.

¶ 32. The Board accepted the State's position on the first question — whether the State's compensation obligations under section 6 of the emergency closing article end when the emergency is over. We give the Board's construction substantial deference. We therefore hold that the employees' right to double compensation under the emergency closing article ended when the emergency ended.

¶ 33. The second question is when did the emergency end, such that the office closing was no longer a result of emergency conditions. The State claimed that the emergency ended after August 29, 2011, the day on which the Governor closed all state offices. As of August 30, the State argued that state employees were doing their normal work, albeit out of temporary locations and under challenging conditions. Ample evidence supported the State's position. For example, the regional director of the Vermont Department of Buildings and General Services testified that there were no immediate hazards in any of the Waterbury complex buildings on August 30. The Deputy Secretary of the Vermont Agency of Natural Resources testified that August 30 was a bright sunny day, that staff of the department had a meeting inside the department offices in the complex, and that nothing in the building created an imminent risk of harm.

¶ 34. In *Roessner*, 12 V.L.R.B. 266, 272 (1989), the Board adopted a definition of "emergency" from the American Heritage Dictionary (New College ed. 1979): a "situation or occurrence of a serious nature, developing suddenly and unexpectedly, and demanding immediate attention." The Board adopted this definition again in the instant case. VSEA has not contested this definition. We adopt it for this decision with the understanding that the "immediate attention" contained in the definition relates to the emergency reasons for closing referenced in section 5 of the emergency closing article.

¶ 35. ■ The Board found that there was no emergency closing as of August 30, 2011.[12] We take that finding to mean that there was neither an emergency nor a closing as of that date. We affirm that there was no emergency and do not have to reach whether there was a closing.[13] The finding that there was no emergency on August 30 was not clearly erroneous. The evidence supported that the state agencies from Waterbury were proceeding with business at temporary locations and no immediate response to conditions in the Waterbury complex was needed. Because there was no emergency on August 30, state employees from the Waterbury complex who were working were not entitled to double compensation on that day or thereafter.

¶ 36. VSEA's second argument is that the Board erred in not holding that the State violated the articles on leave time and applied Personnel Policy 11.3 in a discriminatory fashion because some employees who were not working were required to take leave time. As the Board held, this argument is based on the application and effect of the emergency closing article as VSEA interprets it. Because VSEA has not prevailed on its construction of the emergency closing article, it cannot prevail on its claim with respect to leave time. Because we affirm on that basis, we do not reach VSEA's argument that the Board erred in also ruling that

---

[12] VSEA challenges what it reads as the Board's conclusion that emergencies are of short duration. While we accept VSEA's argument that emergencies can be of long duration, and we note the Board's decision does contain the language VSEA challenges, the Board's conclusion was based on the ample evidence produced by the State on when the emergency ended. Thus, to the extent we would find error in the Board's discussion of an emergency's duration, it is harmless.

[13] As discussed above, we view the Board's definition of a state office or facility to be an additional ground for its decision. We do not reach whether we would affirm its decision based on that ground.

VSEA offered inadequate evidence to prove its allegations with respect to leave time.

*Affirmed.*